















BJR    2/5/01    11:40

3:01-CV-00205    RUFFALO V. EN POINTE

*1*

*CMP.*

1 | James C. Krause, Esq., SBN 066478
Patrick N. Keegan, Esq., SBN 167698
2 | KRAUSE & KALFAYAN
1010 Second Avenue, Suite 1750
3 | San Diego, CA 92101
Tel:   (619) 232-0331
4 | Fax:   (619) 232-4019

5 | Attorneys for Plaintiff
(Additional Counsel on Signature Page)

6

7 | UNITED STATES DISTRICT COURT

8 | SOUTHERN DISTRICT OF CALIFORNIA

9 | GREGG A. RUFFALO, on behalf of himself   ) Case No. **01 CV 0205 L (CGA)**
and all others similarly situated,   )
10 |   ) **CLASS ACTION COMPLAINT FOR**
Plaintiff,   ) **VIOLATIONS OF THE FEDERAL**
11 |   ) **SECURITIES LAWS**
v.   )
12 |   )
EN POINTE TECHNOLOGIES, INC.;   )
13 | ATTIAZAZ "BOB" DIN; JAVED LATIF;   )
NAUREEN DIN; ZUBAIR AHMED; ELLIS   )
14 | POSNER; MARK BRIGGS; VERDELL   ) **JURY TRIAL DEMANDED**
GARROUTTE; JACOB STETTON; ERIC   )
15 | KEATING; ROBERT MERCER; HAMPTON-   )
PORTER INVESTMENT BANKERS LLC; H-   )
16 | P HOLDINGS, LLC; TIME HOLDINGS, LLC;   )
JSL HOLDINGS LP; JSL ENTERPRISES,   )
17 | LLC; JOHN WILLIAM LAURIENTI; and   )
GREGORY WALKER;   )
18 |   )
Defendants.   )
19 |   )
_____ )

20

21

22

23

24

25

26

27

28

Class Action Complaint

1

**TABLE OF CONTENTS**

2  INTRODUCTION AND OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3  JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

4  PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5  CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

6  SUBSTANTIVE ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
   Defendants Manipulate the Market for En Pointe Securities . . . . . . . . . . . . . . . . . . . . . 9
8     Post-Class Period Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

9  CAUSATION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

10  ADDITIONAL SCIENTER ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

11  FRAUD ON THE MARKET ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

12  FIRST CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
   Violations of Section 10(b) of The Securities Exchange Act of 1934
13     and Rule 10b-5 Promulgated thereunder

14  SECOND CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
   Violations of Section 20(a) of The Securities Exchange Act of 1934
15
16  THIRD CLAIM FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
   For Violations of Sections 10(b) and 20A of The Securities Exchange Act of 1934

17  PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18  DEMAND FOR JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

19

20

21

22

23

24

25

26

27

28

1   Plaintiff, by his attorneys, bring this action on behalf of himself and all others similarly

2   situated, and alleges the following upon personal knowledge as to himself and his own activities, and

3   based on investigation conducted by counsel for all other matters.  That investigation has included

4   the thorough review and analysis of public documents, SEC filings, press releases, news articles,

5   Court pleadings and arbitration pleadings concerning the matters set forth herein.

6   **INTRODUCTION AND OVERVIEW**

7   1.     This is a class action on behalf of plaintiff Gregg A. Ruffalo (hereinafter "Plaintiff")

8   and all others who purchased the common stock of En Pointe Technologies, Inc. (hereinafter "En

9   Pointe" or the "Company") between December 7, 1999 and April 13, 2000, inclusive (the "Class

10  Period"), and who have suffered damages as the result of the alleged price manipulation scheme set

11  forth below.   Plaintiff alleges violations of the federal securities laws against En Pointe

12  Technologies, Inc. and ten of its officers and directors[1] who knowingly participated in manipulating

13  the price of En Pointe Technologies, Inc.'s shares.

14  2.     Throughout the Class Period, En Pointe Technologies, Inc. held itself out as a national

15  business to business e-commerce provider of information technology products and value-added

16  services, using proprietary and non-proprietary software and systems to drop-ship maintenance,

17  repair, and operation (MRO) products to its customers through an electronically linked network of

18  allied distributors in the United States.

19  3.     During the relevant period, the Insiders conspired with a small investment bank,

20  Hampton-Porter Investment Bankers LLC (hereinafter "Hampton-Porter"), and its brokers and

21  upper-management to orchestrate a price manipulation scheme that allowed the Insiders of En Pointe

22  Technologies, Inc. to abscond with $50 million of investors' money.  This scheme included

23  Hampton-Porter's participation by: 1) parking excessive amounts of investors' portfolios in En

24  Pointe Technologies, Inc. stock; 2) refusing to execute sell orders; 3) the use of illegal above market

25  buy-ins to dissuade potential short sellers from selling En Pointe Technologies, Inc. stock short; and

26  _____

27  [1]     Defendants Attiazaz "Bob" Din, Javed Latif, Naureen Din, Zubair Ahmed, Ellis Posner, Mark Briggs,
Verdell Garroutte, Jacob Stetton, Eric Keating and Robert Mercer hereinafter are collectively referred to as the
28  "Insiders".

1   4) the dissemination of materially false and misleading statements about En Pointe Technologies,

2   Inc.'s ownership interest in its subsidiary SupplyAccess, Inc. and its future prospects.

3         4.    Hampton-Porter is a wholly owned sub-entity of H-P Holdings, LLC (hereinafter "H-

4   P"). Gregory Walker holds an ownership interest in H-P and is a control person of both entities.

5   Time Holdings, LLC, JSL Enterprises, LLC, and JSL Holdings LP, LLC are all entities controlled

6   by John William Laurienti. On information and belief, John William Laurienti and Gregory Walker

7   orchestrated the pump and dump scheme in conjunction with the Insiders of En Pointe Technologies,

8   Inc. and used these various entities as conduits for their scheme.

9         5.    John William Laurienti (hereinafter "Laurienti") was an interested owner/member of

10   H-P, which in turn has 100% ownership interest in Hampton-Porter. Laurienti is the alter ego of

11   Hampton-Porter and essentially directs its activities. As such, Laurienti is a control person with

12   regard to Hampton-Porter. Laurienti is a recidivist stock manipulator. For example, in October of

13   1995, the Securities and Exchange Commission found that Laurienti failed to properly discharge his

14   supervisory duties while acting as branch manager for Dickinson & Co. and in connection with an

15   unregistered stock offering masterminded by Laurienti. As a result, Laurienti was barred from acting

16   in a proprietary or supervisory capacity with any broker dealer, municipal securities dealer,

17   investment advisor or investment company. In complete disregard of that order, Laurienti has

18   attempted to conceal his involvement with Hampton-Porter (a registered broker-dealer) through his

19   former ownership of H-P, which in turn owns 100% of Hampton-Porter. Moreover, Laurienti has

20   participated in this price manipulation scheme despite the SEC injunction barring him from future

21   violations of the securities laws.

22         6.    Hampton-Porter's misconduct in connection with En Pointe's material misstatements

23   and omissions regarding En Pointe's subsidiary, Supply Access, Inc., enabled the Insiders of En

24   Pointe to abscond with proceeds of $49,742,398 by selling 1,100,107 insider shares to the

25   unsuspecting public. The defendants engaged in this illegal scheme and caused material false and

26   misleading statements to be issued in order to create high demand for En Pointe stock and artificially

27   inflate the price of En Pointe stock, thereby allowing defendants to sell their En Pointe shares at all-

28   time high prices between $40-$45 a share.

Class Action Complaint          2

**JURISDICTION AND VENUE**

7.    This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

8.    This Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

9.    Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Defendants  Hampton-Porter Investment Bankers LLC, H-P Holdings, LLC, Time Holdings, LLC, JSL Enterprises, LLC and  JSL Enterprises, LLC are located in this District, and significant sales of En Pointe securities took place in this District during the Class Period.

10.    In connection with the acts alleged in this complaint, the defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone and Internet communications, and the facilities of the NASDAQ NMS.

**PARTIES**

11.    Plaintiff Gregg A. Ruffalo (hereinafter "Plaintiff") made the following purchase of En Pointe Technologies, Inc. common stock (ENPT) on the NASDAQ NMS during the Class Period: (a) purchased 500 shares on March 30, 2000, at the price of $37.50 per share for a total of $18,750.00 and sold the 500 shares he purchased during the Class Period on October 25, 2000, at the price of $4.3125 per share of a total $2,156.25, resulting in a realized loss of $16,593.75.

12.    Defendant En Pointe Technologies, Inc. (hereinafter "En Pointe" or the "Company") is corporation organized and existing under the laws of the State of Delaware. En Pointe's principal place of business and headquarters located at 100 N. Sepulveda Blvd., 19th Floor, El Segundo, CA 90245. En Pointe currently has 6.53 million shares outstanding.

13.    Defendant Attiazaz "Bob" Din (hereinafter "Bob Din") is En Pointe's CEO, President, and Chairman of the Board of Directors. According to En Pointe's proxy statement dated February 14, 2000, Bob Din was the beneficial owner of 653,702 shares of En Pointe. On February 28, 2000, Bob Din sold 105,100 shares for approximately $5 million in proceeds. On March 15, 2000, Bob Din sold 296,900 shares of En Pointe for an additional $13 million. These two sales, only

three weeks apart, amounted to 61.5% of his ownership position.

14.    Defendant Javed Latif (hereinafter "Latif") was, at all relevant times, the Chief Financial Officer of En Pointe. Latif is the brother-in-law of Bob Din and was appointed by Din on January 1, 1999. On July 26, 2000, En Pointe announced Latif was stepping down to pursue "personal interests." According to En Pointe's proxy statement dated February 14, 2000, Mr. Latif was the beneficial owner of 52,860 shares of En Pointe. On February 28, 2000, Mr. Latif sold 25,000 shares for $1 million in proceeds. On March 15, 2000, Mr. Latif sold 22,185 shares of En Pointe for another $996,442. These two sales, only three weeks apart, amounted to 89.3% of his ownership position.

15.    Defendant Naureen Din was and is En Pointe's Secretary and a Director. Mrs. Din is also the wife of Bob Din. According to En Pointe's proxy statement dated February 14, 2000, Mrs. Din was the beneficial owner of 653,702 shares of En Pointe. On February 28, 2000, Mrs. Din sold 105,100 shares for 5 million dollars. On March 15, 2000, Mrs. Din sold 296,900 shares of En Pointe for 13 million dollars. These two sales, only three weeks apart, amounted to 61.5% of her ownership position.

16.    Defendant Zubair Ahmed (hereinafter "Ahmed") was during the relevant time period and is now a director of En Pointe. According to En Pointe's proxy statement dated February 14, 2000, Mr. Ahmed was the beneficial owner of 807,396 shares of En pointe. On March 15, 2000, Mr. Latif sold 165,000 shares of En Pointe for $8 million in proceeds.

17.    Defendant Ellis Posner (hereinafter "Posner") was during the relevant time period and is now the Vice-President of Sales at En Pointe. According to En Pointe's proxy statement dated February 14, 2000, Mr. Posner was the beneficial owner of 48,220 shares of En Pointe. On February 28, 2000, Mr. Posner sold 25,000 shares for approximately $1 million in proceeds. On March 14, 2000, Mr. Posner sold 8,000 shares of En Pointe for another $347,530. These two sales, only three weeks apart, amounted to 68.4% of his ownership position.

18.    Defendant Mark Briggs (hereinafter "Briggs") was during the relevant time period a director of En Pointe and the Chair of the Company's Compensation Committee. According to En Pointe's proxy statement dated February 14, 2000, Mr. Briggs was the beneficial owner of 14,667

1    shares of En pointe. On February 28, 2000, Mr. Briggs sold 18,000 shares for $869,250 in proceeds.

2          19.     Defendant Verdell Garroutte (hereinafter "Garroutte") was during the relevant time

3    period a director of En Pointe. According to En Pointe's proxy statement dated February 14, 2000,

4    Mr. Garroutte was the beneficial owner of 8,334 shares of En Pointe. On February 28, 2000, Mr.

5    Garroutte sold 10,000 shares for $463,730. Mr. Garroutte is also on the Compensation Committee

6    of En Pointe.

7          20.     Defendant Jacob Stetton (hereinafter "Stetton") was during the relevant time period

8    a Senior Vice President and the General Counsel. According to En Pointe's proxy statement dated

9    February 14, 2000, Mr. Stetton was the beneficial owner of 17,377 shares of En Pointe. On February

10   28, 2000, Mr. Stetton sold 10,000 shares for $463,730 in proceeds. This sale amounted to 58% of

11   his ownership position.

12         21.     Defendant Eric Keating (hereinafter "Keating") was during the relevant time period

13   an officer of En Pointe with the title "Director of National Services". On February 28, 2000, Mr.

14   Keating sold his entire lot of En Pointe shares, such transaction amounting to a sale of 5,600 shares

15   for $262,183.

16         22.     Defendant Robert Mercer (hereinafter "Mercer") was during the relevant time period

17   a Vice President with En Pointe. On February 28, 2000, Mr. Mercer sold his entire lot of En Pointe

18   shares, such transaction amounting to a sale of 7,322 shares for $339,543.

19         23.     Defendant Hampton-Porter Investment Bankers LLC (hereinafter "Hampton-Porter")

20   is a limited liability company organized and existing under the laws of the State of California with

21   its principal place of business 600 West Broadway, 14th Floor, San Diego, California.  Hampton-

22   Porter is an investment banking and brokerage company, and a member of the National Association

23   of Securities Dealers. Hampton-Porter was the conduit through which the Defendants pursued their

24   scheme, by causing it to publish false and misleading statements regarding En Pointe, and by

25   otherwise manipulating the market for En Pointe stock. Specifically, Hampton-Porter was controlled

26   by Defendants Laurienti, Gregory Walker and H-P.

27         24.     Defendant H-P Holdings, LLC (hereinafter "H-P") is a limited liability company

28   organized and existing under the laws of the State of California with its principal place of business

Class Action Complaint                              5

1  600 West Broadway, 14th Floor. San Diego, California. H-P, by and for its members, maintains a
2  100% ownership interest in Hampton-Porter. Gregory Walker owns 100% of H-P.

3      25.  Defendant Time Holdings, LLC (hereinafter "Time Holdings") is a limited liability
4  company organized and existing under the laws of the State of California with its principal place of
5  business 600 West Broadway, 14th Floor, San Diego, California. Time Holdings is a holding
6  company used as an alter ego for its sole members, Laurienti and Walker. Time Holdings, at the
7  time of the allegations contained herein, held approximately 522,700 shares of En Pointe (ENPT).
8  Time Holdings also received hundreds of thousands of dollars from Hampton-Porter labeled as
9  "consulting fees." Time Holdings principle place of business is located at 600 W. Broadway, 14th
10  Floor, San Diego, CA 92101.

11      26.  Defendant JSL Holdings LP (hereinafter "JSL Holdings") is a limited partnership
12  organized and existing under the laws of the State of California with its principal place of business
13  12626 High Bluff Drive, Suite 350, San Diego, California. Laurienti controlled JSL and maintained
14  an account at Merrill Lynch with at least 65,000 shares of En Pointe in JSL's name.

15      27.  Defendant JSL Enterprises, LLC (hereinafter "JSL Enterprises") is a limited liability
16  company organized and existing under the laws of the State of California with its principal place of
17  business 12626 High Bluff Drive, Suite 350, San Diego, California. JSL Enterprises, LLC is the sole
18  general partner of JSL Holdings, LP, and is controlled by Laurienti.

19      28.  Defendant John William Laurienti (hereinafter "Laurienti") was an interested
20  owner/member of H-P, which in turn has 100% ownership interest in Hampton-Porter. Laurienti is
21  the alter ego of Hampton-Porter and essentially directs its activities. As such, Laurienti is a control
22  person with regard to Hampton-Porter.

23      29.  Defendant Gregory Walker (hereinafter "Walker") holds an ownership interest in H-P,
24  which in turn has 100% ownership interest in Hampton-Porter. As such, Walker is a control person
25  with regard to Hampton-Porter and H-P.

26      30.  During the Class Period, the defendants, individually and in concert, directly and
27  indirectly, engaged and willfully participated in a continuous course of conduct to misrepresent and
28  conceal material information regarding En Pointe's subsidiary SupplyAccess, Inc. as specified herein

Class Action Complaint      6

1 in order to sell $50 million worth of En Pointe shares on the open market.  Defendants employed

2 devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of conduct

3 as herein alleged in an effort to increase and maintain an artificially high market price for En Pointe

4 shares.  This included the formulation of, making, and/or participation in the making of untrue

5 statements of material facts, and the omission to state material facts necessary in order to make the

6 statements made, in light of the circumstances under which they were made, not misleading, which

7 operated as a fraud and deceit upon Plaintiff and the Class.

8 **CLASS ACTION ALLEGATIONS**

9 31.    Plaintiff brings this class action under Rules 23(a) and 23(b)(3) of the Federal Rules

10 of Civil Procedure, on behalf of a class of persons who bought or otherwise acquired En Pointe

11 common stock during the Class Period (or their successors in interest) and who suffered damages

12 thereby ("the Class").  Excluded from the Class are the Defendants named herein, members of the

13 immediate families of the Defendants, any firm, trust, partnership, corporation, officer, director or

14 other individual or entity in which a Defendant has a controlling interest or which is related to or

15 affiliated with any of the Defendants, and the legal representatives, heirs, successors in interest or

16 assigns of any such excluded party.

17 32.    The Class is so numerous that joinder of all members is impracticable.  As of May

18 11, 2000, En Pointe had 6.5 million shares of common stock issued and outstanding, and such shares

19 were publicly traded on the NASDAQ NMS during the Class Period. The exact number of members

20 of the Class is not known at this time, but is believed to number in the thousands.

21 33.    Plaintiff will fairly and adequately protect the interests of the members of the Class,

22 and Plaintiff has no interests which are contrary or in conflict with the interests of the Class members

23 that they seek to represent.  Plaintiff has retained competent counsel experienced in class action

24 litigation under the federal securities laws to ensure such protection, and intends to prosecute this

25 action vigorously.

26 34.    Plaintiff's claims are typical of the members of the Class, because Plaintiff and all

27 of the Class members sustained damages arising from the same wrongful conduct complained of

28 herein.

Class Action Complaint                          7

1    35.    A class action is superior to all other available methods for the fair and efficient

2    adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

3    damages suffered by individual members of the Class may be relatively small, the expense and

4    burden of individual litigation make it impossible for the members of the Class to individually seek

5    redress for the wrongs done to them.  There will be no difficulty in the management of this action

6    as a class action.

7    36.    Questions of law and fact common to the members of the Class predominate over any

8    questions that may affect only individual members in that Defendants have acted on grounds

9    generally applicable to the entire Class.  Among the questions of law and fact common to the Class

10   are:

11   a)    whether the federal securities laws were violated by Defendants' acts as
           alleged herein;
12   b)    whether Defendants' omitted and/or misrepresented material facts and
           whether Defendants breached any duty to convey material facts or to correct
13         material facts previously disseminated;
     c)    whether Defendants participated in and pursued the common course of
14         conduct complained of herein;
     d)    whether Defendants acted with scienter in omitting and/or misrepresenting
15         material facts;
     e)    whether the price of En Pointe common stock was artificially inflated during
16         the Class Period as a result of the material misrepresentations and omissions
           complained of herein;
17   f)    whether the Insiders were control persons of En Pointe as alleged herein; and
     g)    whether members of the Class have sustained damages and, if so, the proper
18         measure of such damages.

19   ## SUBSTANTIVE ALLEGATIONS

20   ### Background

21   37.    During 1999, companies in the B2B (Business to Business) market started to enjoy

22   unusual attention from investors because many market research companies estimated the market

23   potential to be very large.  For example, International Data Corporation estimated that "Internet-

24   based procurement applications will grow from $187 million in 1998 to $8.5 billion in 2003, well

25   on the way in automating the estimated $1.3 trillion that U.S. corporations spend on indirect

26   purchases."

27   ### Defendants Manipulate the Market for En Pointe Securities

28   38.    On or about December 7, 1999, several En Pointe officers participated in a conference

call with securities analysts and investors.  Specifically, three En Pointe executives (Bob Din, Latif, and Posner) participated in this conference call.  During the call, Bob Din commented on En Pointe's new "wholly owned" subsidiary SupplyAccess.  Bob Din further stated:

> We have recently launched a new subsidiary, SupplyAccess, Inc., which is being positioned to compete well against entities such as Ariba and Commerce One. We are in the process of seeking a private placement of securities for no less than $9.75M and no more than $18.75M.

39.     Ariba and Commerce One were and are the two leading companies in the B2B exchange market and experienced strong demand for their stock in 1999.  Bob Din, in the December 7, 1999 conference call, characterized En Pointe's subsidiary SupplyAccess as "being positioned to compete well against" and thus a direct competitor to both Ariba and Commerce One.  This statement was patently false.  In fact, neither En Pointe nor SupplyAccess are  significant players in the B2B market in which Ariba and Commerce One operate, and they were not positioned to offer any significant competition to those companies.

40.     In January 2000, Broadview International, LLC released a research report entitled "Market Maps of B2B Digital Marketplaces and Web-Enabled Supply Demand Management Companies."  Broadview's report sought to account for every known public and private company operating in the B2B market.  Additionally, Broadview categorized each company into market segments identifying the focus of the B2B companies. Ariba and Commerce One were characterized as "Super Verticals" as opposed to just horizontal or vertical market B2B companies.  This categorization of Ariba and Commerce One reflected their domination of the B2B space.  Most importantly, neither En Pointe nor SupplyAccess were mentioned as operating in any B2B market whatsoever -- in fact they were not even mentioned in the report.

41.     A March 13, 2000 press release published by Commerce One, Inc. further demonstrates the fact that En Pointe and SupplyAccess were not and never have been competitors of Commerce One. This press release lists En Pointe as one of over 30 "vendors and suppliers" who had "endorsed Commerce One's Round Trip capability."  This statement makes it clear that En Pointe was at best a reseller of Commerce One's technology, rather than a competitor in the B2B market.

42.     During the December 7, 1999 conference call, defendant Bob Din also announced that the private placement offering of SupplyAccess would garner a total of "no less than $9.75 million and no more than 18.75 million." The maximum offering of $18.75 million would have left En Pointe with a majority interest in SupplyAccess.

43.     This statement was knowingly misleading because Bob Din, in light of his position and access to internal private placement memoranda for SupplyAccess, knew at that time that a supplemental offering was being contemplated for another $7.6 million, which in turn would leave En Pointe with a minority ownership interest in SupplyAccess.

44.     That same day, December 7, 2000, defendants formally informed the market concerning the Company's planned private placement of SupplyAccess stock with the filing of a Form 8-K with the SEC. This document stated, in relevant part:

> The Company is in the process of seeking funding for a private placement of securities in its recently incorporated, currently wholly owned, direct-procurement focused subsidiary, SupplyAccess, Inc., for no less than $9.75 million and no more than $18.75 million.

45.     Contemporaneously with these false and misleading statements, Laurienti was quietly acquiring shares of En Pointe through his various alter egos, Time Holdings, LLC, JSL Enterprises, LLC, and JSL Holdings, LP. Time Holdings alone acquired 522,700 shares of En Pointe from August to December of 1999. This holding alone amounted to an 8.8% stake in En Pointe, just below the 10% insider threshold. Not only did Laurienti ultimately acquire these shares but he also consistently bought and sold the stock to create the appearance of active trading and interest in the stock. (*See* Exhibit A: Schedule 13D/A of Time Holdings, LLC).

46.     In conjunction with his own acquisition of En Pointe stock, Laurienti ordered Hampton-Porter registered representatives to buy En Pointe stock for their clients. More importantly, Laurienti, Walker and H-P caused Hampton-Porter to promise their registered representatives special incentive payments to convince their clients to purchase En Pointe stock, and then to persuade their clients not to sell En Pointe once it was purchased. (*See* Exhibit B: Declaration of Adam Gilman, a Hampton-Porter registered representative). In this regard, Defendants worked in concert to create artificial demand for En Pointe stock, in order to inflate the share price for their

1   own benefit and profit.

2      47.  After the early December conference call and 8-K filing, the share price of En Pointe

3   began to steadily rise as the market digested the news that En Pointe was a majority owner of

4   SupplyAccess, a company that was "well positioned" to compete with Wall Street darlings Ariba and

5   Commerce One.  In early December, En Pointe stock traded around $10 per share and an average

6   volume of about 30 to 50 thousand shares a day.  In fact, En Pointe stock had never traded above $14

7   a share during the prior two years.  By December 31, 1999, En Pointe closed at $27.50 per share.

8   On February 25, 2000, En Pointe reached an all-time high of $52 per share.  Recognizing the

9   artificially inflated price for what it was, the Insiders sold $50 million worth of their stock on two

10   days; February 28th and March 15th, 2000.  (*See* ¶¶ 72-81).

11      48.  On January 13, 2000, En Pointe filed its annual report on SEC Form 10-K.  This

12   document stated, in relevant part:

13      The Company has recently formed a new subsidiary, SupplyAccess, Inc., to continue
   the maintenance and enhancement of these systems, and to offer some of the benefits
14      of these systems to third parties. A private placement of the capital stock of this
   subsidiary is currently in process; there can be no assurance, however, that the private
15      placement will be successfully completed.

16      49.  The quoted statements in the January 13, 2000 Form 10-K were materially false and

17   misleading at the time that they were made, in that Defendants concealed the fact that En Pointe was

18   poised to proceed with a supplemental private placement offering which would reduce the

19   Company's ownership in SupplyAccess to a minority position.

20      50.  Throughout the Class Period, Laurienti, Walker and H-P and caused Hampton-Porter

21   to consistently advocate the "hidden value" of SupplyAccess to En Pointe's stock price.  For

22   example, in a research report published January 11, 2000, Hampton-Porter stated:

23      We rate ENPT Accumulate, Speculative. While En Pointe Technologies' stock price
   has run more than 280% in the past two weeks and the valuation does appear lofty
24      on a near term basis, we believe that the current price of the stock reflects a few
   critical metrics that should sustain an increase in valuation over the mid to longer
25      term.
           * * * *
26      *[W]e believe the company's true strategic value is in its Internet-related
   subsidiaries, Firstsource.com and SupplyAccess Inc.*, and that the recent run up in
27      terms of stock price is due to market speculation in terms of these businesses. En
   Pointe currently holds a 71% stake in Firstsource and a 51% stake in SupplyAccess
28      (upon completion of an $18 million private placement). As each of these companies

ramp in terms of revenue and capturing market share, we believe that they represent a significant value to En Pointe shares. Moreover, an IPO of SupplyAccess could unleash enormous additional value to En Point shareholders, given a conservative valuation relative to its peers on the street (see discussion below). *At present, we feel that En Point represents a compelling indirect play in the business-to-business eCommerce market.*

\* \* \* \*

SupplyAccess Inc. focuses on large enterprise e-procurement solutions in the business-to-business marketplace, including procurement of IT products and services, operating resources and other vertical products and services. Strategic partners include SAP AG (NYSE: SAP) and Microsoft Corp. (Nasdaq: MSFT). In its first two quarters of operation, the company has already processed more than $100 million in transactions.

Growth in the business-to-business Internet commerce market continues to explode, and is affecting the way small businesses to large corporations are doing business. Business-to-business eCommerce enables companies to drastically reduce costs, increase and sustain ROI and gain competitive advantages over their peers. According to Giga Information Group, savings due to the use of business-to-business eCommerce solutions for US businesses will explode from $15 billion in 1998 to about $600 billion in 2002. Moreover, one-fourth of all US business-to-business purchasing will be done online by 2003, reaching approximately $2.8 trillion in transaction value, according to the Boston Consulting Group.

*We believe that SupplyAccess is poised to take advantage of this exponentially growing business-to-business eCommerce market, differentiating itself from its competitors such as CommerceOne, Ariba and PurchasePro on a number of different levels.*

\* \* \* \*

[W]e believe that SupplyAccess has a significant opportunity in the huge B2B market, and therefore makes a compelling value proposition for shareholders of En Pointe. *En Pointe is in the process of issuing a private placement for SupplyAccess, raising $18 million. Upon completion, En Pointe will retain a 51% stake in SupplyAccess.* Given the street's interest in e-procurement companies and SupplyAccess' competitive positioning in this space, a SupplyAccess IPO would bring substantial value to En Pointe. (Emphases added.)

51.     Through Hampton-Porter, Laurienti, Walker and H-P continued to feed similar false and misleading information to the market on February 4, 2000, when Hampton-Porter published another analyst report containing the following statements:

To reiterate, we believe that SupplyAccess has a significant opportunity in the huge B2B market, and therefore makes a compelling value proposition for shareholders of En Pointe. En Pointe is in the process of issuing a private placement for SupplyAccess, raising $18 million. Upon completion, En Pointe will retain a 51% stake in SupplyAccess. Given the street's interest in e-procurement companies and SupplyAccess' competitive positioning in this space, a SupplyAccess IPO would bring substantial value to En Pointe.

52.     The January 11 and February 4, 2000 compared SupplyAccess to Ariba and Commerce One on a market capitalization basis. For example, in the February 4, 2000 report, H-P, and Jaurienti cause Hampton-Porter to state:

| Company | Recent Stock Price | Market Capitalization: |
|---|---|---|
| Ariba- | $172 | 15,629,640 |
| Commerce One- | $214 | 15,470,362 |
| Purchase Pro- | $119 | 3,358,741 |
| En Pointe- | $38 | 227,000 |

Assuming that SupplyAccess is valued at a conservative multiple of 60X year '00 revenues to its peers, (CMRC @ 123x year '00; and ARBA @ 80x year '00), with projected revenue of $7,591,000 in its first year of operations, SupplyAccess should be valued at approximately $17 per share (28,000,000 basic outstanding). An initial public offering of SupplyAccess would unleash value to En Pointe in the following manner: Upon completion of an $18 million private placement, En Pointe would own 51% of SupplyAccess (which should be valued at approx. $17 per share). This would in turn, bring an additional $40 to En Pointe's current $38.25 trading level. We believe that trading 60x '00 revenues, an IPO of SupplyAccess would bring somewhere between $35 and $40 of value to En Pointe's market capitalization.

53.     The quoted statements in the January 11, 2000 and February 2000 reports were materially false and misleading at the time that they were published because: a) SupplyAccess was not a direct competitor of either Commerce One or Ariba and has never been; b) Defendants concealed and affirmatively misrepresented the fact that En Pointe and the Insiders were planning a $7.6 million supplemental offering of SupplyAccess preferred stock which would reduce En Pointe's ownership below that of a majority position; and c) the reports concealed the fact that Defendants were engaged in a scheme to artificially inflate En Pointe's share price so that Defendants could sell En Pointe stock to the unsuspecting public for massive illegal profits, and that Hampton-Porter was offering its sales representatives special incentive payments for sales of En Pointe stock.

54.     On February 10, 2000, En Pointe and the Insiders published a press release which stated, in relevant part:

With the new business systems now operational, En Pointe is at the forefront of business-to-business e-commerce utilizing its unique tool, SupplyAccess(TM). . . .

* * * *

The Company is in the process of obtaining funding for a private placement of securities in its subsidiary, SupplyAccess, Inc.

55.     En Pointe's and the Insiders' statements in the February 10, 2000 press release were materially false and misleading at the time that they were published, in that they concealed the facts that: a) contrary to the certain of Defendants' prior statements, neither the Company not SupplyAccess was "well positioned" to compete with Ariba or Commerce One in the business-to-

business e-commerce marketplace; and b) En Pointe was poised to proceed with a supplemental private placement offering which would reduce the Company's ownership in SupplyAccess to a minority position.

56.     On February 25, 2000, En Pointe and the Insiders' made another announcement concerning their planned private placement of SupplyAccess equity, stating that "its subsidiary, SupplyAccess, Inc., has completed a first closing of a $26.5 million investment in SupplyAccess(TM) Series A Preferred Stock." This statement was materially false and misleading at the time that it was made, because it failed to disclose, and affirmatively concealed the fact that this sale would reduce En Pointe's ownership in SupplyAccess to a minority position.

57.     On March 2, 2000, En Pointe filed a report on Form 8-K with the SEC, stating in part:

> The Company announces that its web procurement business-to-business subsidiary, SupplyAccess, Inc., recently completed an initial funding of a private placement of Series A preferred stock in the gross amount of $18 million. Such funding resulted in the sale of 12 million shares of preferred stock at $1.50 per share, representing 46.1% of the total 26 million shares of outstanding stock. With the conclusion of this sale, the Company's ownership in SupplyAccess, Inc. is 53.9%.

58.     The quoted statements in the March 2, 2000 Form 8-K were materially false and misleading at the time that they were made, in that En Pointe and the Insiders concealed the fact that En Pointe was poised to proceed with a supplemental private placement offering which would reduce the Company's ownership in SupplyAccess to a minority position.

59.     On April 13, 2000, En Pointe and the Insiders issued a press release announcing the closing of a supplemental sale of SupplyAccess preferred stock of $7.6 million and that En Pointe was "no longer a majority stockholder of SupplyAccess, Inc." In fact, it was later revealed that En Pointe's ownership interest had declined to 45.1%. In response to this stunning revelation, En Pointe's stock price plummeted from an intra-day high of $28.50 to close at $12.87 on over 2 million shares traded.

60.     En Pointe shares have not traded over $13 per share since and currently trade around $4 per share. This price reflects less than a $30 million market capitalization for the entire company. Insiders profited $50 million dollars alone from their insider sales on February 28 and March 15, 2000.

61.     During and immediately after the April 13, 2000 crash of En Pointe stock, and in order to relieve some of the selling pressure, Hampton-Porter's trading room, at the direction of defendants Laurienti, Walker and H-P refused to accept sell orders from clients.   Defendants Laurienti, Walker and H-P also caused Hampton-Porter to pressure its registered representatives to sell En Pointe stock to their customers without regard to its suitability.

62.     The aftermath of the April 13 revelation was reported by Bloomberg News as follows:

> En Pointe Technologies Inc. (ENPT) shares fell $14.63, or 53 percent, to $12.88. The provider of business-to-business information technology products and services said it's no longer the majority owner of SupplyAccess, Inc., an operator of a business procurement web site.

## Post-Class Period Events

63.     On April 14, 2000, a Hampton-Porter client named Steven Crosby went to Hampton-Porter's offices and confronted his broker and several other Hampton-Porter representatives. He was informed that Defendants were working feverishly to support En Pointe's share price, and that Bob Din had agreed to provide $1.5 million to Hampton-Porter secretly to allow Defendants to create artificial demand for the stock and prop up the plummeting share price. He was also informed that Hampton-Porter was purposefully disguising these purchases to make them appear to be made through different brokerage firms. These facts are alleged in an arbitration complaint styled Crosby v. Hampton-Porter Investment Banking, LLC, filed with the National Association of Securities Dealers in June of 2000.

64.     On April 17, 2000, in a last-ditch effort to boost En Pointe's share price and continue with Defendants' scheme, Laurienti, Walker and H-P caused Hampton-Porter to publish another report touting En Pointe and SupplyAccess.  This report contained a "strong buy" recommendation for En Pointe's stock and stated that En Pointe's stock had been "oversold due to market conditions."

65.     As of January 2001, the Company's share price still has not recovered, hovering around $4 per share.

## CAUSATION ALLEGATIONS

66.     En Pointe's common stock was publicly traded on the NASDAQ NMS at all relevant times. Defendants' material misrepresentations, and omissions manipulative contrivances had the

1   effect of artificially inflating the price of En Pointe's stock.

2       67.     Defendants had a duty to promptly disseminate accurate and truthful information with

3   respect to En Pointe's financial and operational condition or to cause and direct that such information

4   be disseminated and to promptly correct any previously disseminated information that was

5   misleading to the market.  As a result of their failure to do so, the price of En Pointe's stock price

6   was artificially inflated during the Class Period, damaging Plaintiff and the Class.

7       68.     Defendants' false and misleading statements and omissions in their public statements

8   directly caused losses to the Class. On the strength of these false statements, misrepresentations and

9   material omissions, the Company's stock was artificially inflated to a Class Period high of $52 on

10  February 25, 2000 and remained artificially inflated until the end of the Class Period.  Plaintiff and

11  all class members who bought shares during the Class Period were harmed thereby, when the share

12  prices plummeted on April 13, 2000 upon the revelation of the true nature of the Company's

13  ownership of SupplyAccess.

14      69.     Until shortly before Plaintiff filed this Complaint, he was unaware of all of the facts,

15  as described herein, and could not have reasonably discovered the Defendants' fraudulent scheme

16  by the exercise of reasonable diligence.

17                    **ADDITIONAL SCIENTER ALLEGATIONS**

18      70.     Each misrepresentation and/or omission of material fact alleged herein was made with

19  reckless disregard for, or knowledge of its false and misleading nature.  At all relevant times, each

20  Defendant was in a position to know, and did in fact know the material facts regarding the Company

21  as set forth herein.  Specifically, Defendants were in a position to know, and indeed must have

22  known that the Company was not actively operating as a competitor to Ariba and Commerce One.

23  Indeed, as described above, En Pointe was listed in a Commerce One press release as a ***vendor*** of

24  Commerce One's services and products, rather than as a competitor.  Similarly, Defendants were in

25  a position to know, and must have known or recklessly disregarded the fact that the Company was

26  planning an expanded private placement offering of SupplyAccess securities which would reduce

27  the Company's ownership of SupplyAccess below 50%. Indeed, by February 25, 2000, Defendants

28  had done a primary closing on the supplemental offering, and thus had to know the full terms of the

1    deal by the date, and almost certainly months before.

2    71.    Each Defendant had the opportunity to commit and participate in the fraud described

3    herein.  The Insiders were each top officers, directors and/or shareholders of En Pointe and thus

4    controlled the Company's press releases, corporate reports, SEC filings and communications with

5    analysts.  Thus, they controlled the public dissemination of and could falsify and/or omit, the

6    material information about En Pointe's business prospects and operations, that reached the public

7    and affected the price of En Pointe stock.

8    72.    Despite the fact that it is unlawful for any person who is an officer, director or

9    controlling person of an issuer to sell stock in the issuer at a time when he/she knows material

10   information about the issuer which would significantly affect the market price of the issuer's

11   security, the Insiders sold thousands of En Pointe shares to the unsuspecting public, while concealing

12   the scheme to artificially inflate the price of En Pointe securities.  The Insiders' selling during the

13   Class Period is summarized as follows:

| INSIDER | NUMBER OF SHARES | PROCEEDS |
|---|---:|---:|
| Naureen and Bob Din | 202,000 | 8,958,780 |
| Mediha Din[2] | 100,000 | 4,339,000 |
| Ali Mohyuddin[3] | 100,000 | 4,393,711 |
| Ahmed | 165,000 | 7,660,537 |
| Briggs | 18,000 | 869,249 |
| Garrourte | 10,000 | 463,729 |
| Latif | 47,185 | 2,154,802 |
| Posner | 33,000 | 1,506,853 |
| Stetton | 10,000 | 463,730 |
| Mercer | 7,322 | 339,542 |
| Keating | 5,600 | 262,182 |
| **TOTAL** | **698,017** | **$35,751,115** |

[2]    Mediha Din is the minor daughter of Bob and Naureen Din.

[3]    Ali Mohyuddin is the son of Bob and Naureen Din.

73.   During the Class Period, Naureen Din made the following sales of En Pointe common stock while in possession of material adverse information concerning the Company's business and finances as described herein:

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 02-28-00 | 20,000 | $44.05 | $881,000 |
| 02-29-00 | 30,000 | $42.73 | $1,281,900 |
| 03-01-00 | 15,000 | $45.46 | $681,900 |
| 03-06-00 | 30,000 | $40.83 | $1,224,900 |
| 03-08-00 | 53,000 | $43.78 | $2,320,340 |
| 03-10-00 | 24,000 | $50.36 | $1,208,640 |
| 03-14-00 | 20,000 | $45.66 | $913,200 |
| 03-15-00 | 10,000 | $44.69 | $446,900 |
| TOTAL: | 202,000 | | $8,958,780 |

74.   During the Class Period, Ahmed made the following sales of En Pointe common stock while in possession of material adverse information concerning the Company's business and finances as described herein:

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 03-01-00 | 15,000 | $45.20 | $678,000 |
| 03-02-00 | 10,000 | $43.25 | $432,500 |
| 03-03-00 | 10,000 | $43.54 | $435,400 |
| 03-07-00 | 15,000 | $42.66 | $639,900 |
| 03-09-00 | 63,300 | $48.51 | $3,070,683 |
| 03-10-00 | 1,700 | $49.62 | $84,354 |
| 03-13-00 | 30,000 | $48.05 | $1,441,500 |
| 03-15-00 | 20,000 | $43.91 | $878,200 |
| TOTAL: | 165,000 | | $7,660,537 |

/ / /

/ / /

/ / /

Class Action Complaint

18

75.   During the Class Period, Briggs made the following sales of En Pointe common stock while in possession of material adverse information concerning the Company's business and finances as described herein:

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 02-28-00 | 8,000 | $51.15 | $409,200 |
| 02-28-00 | 5,000 | $47.55 | $237,750 |
| 02-28-00 | 1,191 | $44.46 | $52,951 |
| 02-29-00 | 3,809 | $44.46 | $169,348 |
| TOTAL: | 18,000 | | $869,249 |

76.   During the Class Period, Garroutre made the following sales of En Pointe common stock while in possession of material adverse information concerning the Company's business and finances as described herein:

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 02-28-00 | 5,000 | $47.55 | $237,750 |
| 02-28-00 | 1,191 | $47.55 | $56,632 |
| 02-29-00 | 2,142 | $44.46 | $95,233 |
| 02-29-00 | 1,667 | $44.46 | $74,119 |
| TOTAL: | 10,000 | | $463,729 |

77.   During the Class Period, Latif made the following sales of En Pointe common stock while in possession of material adverse information concerning the Company's business and finances as described herein:

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 02-28-00 | 15,477 | $47.55 | $735,931 |
| 02-29-00 | 9,523 | $44.36 | $422,440 |
| 03-01-00 | 5,000 | $44.96 | $223,800 |
| 03-03-00 | 9,100 | $45.11 | $410,501 |
| 03-10-00 | 1,100 | $50.00 | $55,000 |
| 03-15-00 | 6,985 | $43.97 | $307,130 |
| TOTAL: | 47,185 | | $2,154,802 |

78.   During the Class Period, Posner made the following sales of En Pointe common stock while in possession of material adverse information concerning the Company's business and finances as described herein:

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 02-28-00 | 10,000 | $47.55 | $475,500 |
| 02-28-00 | 5,000 | $47.55 | $237,750 |
| 02-28-00 | 477 | $47.55 | $22,681 |
| 02-29-00 | 9,523 | $44.46 | $423,392 |
| 03-06-00 | 5,000 | $41.21 | $206,050 |
| 03-14-00 | 3,000 | $47.16 | $141,480 |
| TOTAL: | 33,000 | | $1,506,853 |

79.   During the Relevant Period, Stetton made the following sales of En Pointe common stock while in possession of material adverse information concerning the Company's business and finances as described herein:

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 02-28-00 | 6,191 | $47.55 | $294,382 |
| 02-29-00 | 3,809 | $44.46 | $169,348 |
| TOTAL: | 10,000 | | $463,730 |

80.   During the Class Period, Mercer made the following sales of En Pointe common stock while in possession of material adverse information concerning the Company's business and finances as described herein:

| DATE | SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 02-28-00 | 4,533 | $47.55 | $215,544 |
| 02-29-00 | 467 | $44.46 | $20,762 |
| 02-29-00 | 2,322 | $44.46 | $103,236 |
| TOTAL: | 7,322 | | $339,542 |

/ / /

/ / /

81.   During the Class Period, Keating made the following sales of En Pointe common stock while in possession of material adverse information concerning the Company's business and finances as described herein:

| DATE | SHARES | PRICE | PROCEEDS |
|------|--------|-------|----------|
| 02-28-00 | 1,000 | $48.87 | $48,870 |
| 02-28-00 | 1,600 | $47.55 | $76,080 |
| 02-28-00 | 1,247 | $47.55 | $59,294 |
| 02-29-00 | 1,753 | $44.46 | $77,938 |
| **TOTAL:** | **5,600** | | **$262,182** |

82.   These sales are unusual and suspicious in their timing and amount. These sales took place shortly after the Defendants primed the market with their talk of being "well positioned" to compete with Ariba and Commerce One and their SupplyAccess venture. Defendants' sales were also timed to precede the announcement that En Pointe's ownership of SupplyAccess had fallen below 50%.

83.   The combination of attributable knowledge with the evident profit incentives for the various Defendants creates a strong inference of scienter.

## FRAUD ON THE MARKET ALLEGATIONS

84.   At all relevant times, the market for En Pointe common stock was an efficient market for the following reasons, among others:

    a)   At all relevant times during the Class Period, En Pointe's common stock was listed and actively traded on the NASDAQ NMS, a highly efficient national securities market. During the Class Period, the Company had approximately 6.5 million shares of common stock issued and outstanding;

    b)   As a registered and regulated issuer of securities, En Pointe filed periodic reports with the SEC and the NASDAQ NMS, in addition to the frequent voluntary dissemination of information described in this Complaint; and

    c)   Several financial analysts covered and reported on En Pointe's developments, and disseminated such reports to the investing public.

85.   As a result of the above, the market for En Pointe securities promptly digested current information with respect to En Pointe from all publicly available sources and reflected such information in En Pointe's stock prices. Under these circumstances, all purchasers of En Pointe stock during the Class Period suffered similar injury through their purchase of securities at prices

1   which were artificially inflated by the Defendants' manipulative activities. Thus, a presumption of

2   reliance applies.

### FIRST CLAIM FOR RELIEF
#### Violations of Section 10(b) of The Securities Exchange Act of 1934 and Rule 10b-5 Promulgated thereunder
(Against All Defendants)

86.     Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

87.     During the Class Period, Defendants En Pointe,  Bob Din, Latif, Naureen Din, Ahmed, Posner, Briggs, Garroutte, Stetton, Keating, Mercer, Hampton-Porter, H-P, Time Holdings, JSL Holdings, JSL Enterprises, Laurienti and Walker engaged in a plan, scheme and course of business which operated as a fraud upon Plaintiff and the Class, and made various untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the Class as set forth above. The purpose and effect of this scheme was to induce Plaintiff and the Class to purchase the Company's common stock during the Class Period at artificially inflated prices.

88.     By reason of the foregoing, Defendants knowingly or recklessly violated Section 10(b) of the Securities Exchange Act of 1934 (hereinafter "Exchange Act") and Rule 10b-5 promulgated thereunder in that they themselves or a person whom they controlled: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and the Class in connection with their purchases of the Company's common stock during the Class Period.

89.     As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the representations described above, Plaintiff and the Class relied, to their detriment, directly on the misstatements or the integrity of the market both as to price and as to whether to purchase these securities. Plaintiff and the Class would not have purchased En Pointe  stock at the prices they paid,

1  or at all, if they had been aware that the market prices had been artificially and falsely inflated by

2  Defendants' false and misleading statements and omissions.  At the time of the purchase of En

3  Pointe stock by Plaintiff and the Class, the fair market value of said common stock was substantially

4  less than the price paid by Plaintiff.  Plaintiff and the Class have suffered substantial damages as a

5  result.

### SECOND CLAIM FOR RELIEF
#### Violations of Section 20(a) of The Securities Exchange Act of 1934
(Against Defendants Attiazaz "Bob" Din, Javed Latif, Naureen Din, Zubair Ahmed,
Ellis Posner, Mark Briggs, Verdell Garroutte, Jacob Stetton, Eric Keating,
Robert Mercer, John William Laurienti, Gregory Walker, H-P Holdings, LLC,
and JSL Enterprises, LLC)

90.     Plaintiff incorporates by reference and realleges all preceding paragraphs as though
fully set forth herein.

91.     Defendants Bob Din, Latif, Naureen Din, Ahmed, Posner, Briggs, Garroutte, Stetton,
Keating and Mercer are liable for En Pointe's material misrepresentations and omissions complained
of herein under §20(a) of the Exchange Act in that they functioned as control persons of En Pointe
by virtue of their executive and directorial positions with the Company, their knowledge of and
involvement in the business of the Company, their daily access to confidential information regarding
the operations and finances of the Company, and their power and ability to make public statements
on behalf of En Pointe to shareholders, potential investors and the media during the Class Period.
As such, they had the power and ability to control the Company's actions.

92.     During the Class Period, defendants Laurienti, Walker and H-P were control persons
of Hampton-Porter, in that H-P owned 100% of Hampton-Porter, Walker has a majority ownership
interest in H-P and Laurienti was empowered by Walker to direct Hampton-Porter's activities and
communications.  In this regard, H-P (through Walker) and Laurienti had direct access to Hampton-
Porter's proprietary information systems, and had ultimate control of Hampton-Porter's trading
schemes and communications functions, including the publishing of analyst reports.

93.     During the Class Period, defendants Laurienti and JSL Enterprises were control
persons of JSL Holdings, in that JSL Enterprises is the sole general partner of JSL Holdings and
Laurienti has a majority ownership interest in JSL Holdings.  In this regard, Laurienti and JSL

1  Enterprises had knowledge of and involvement in the day to day business of JSL Holdings. As such,

2  they had the power and ability to control JSL Holdings' actions.

3      94.    During the Class Period, Laurienti was a control person of JSL Enterprises, in that

4  Laurienti has a majority ownership interest in JSL Enterprises.  In this regard, Laurienti had

5  knowledge of and involvement in the day to day business of JSL Holdings.  As such, they had the

6  power and ability to control JSL Enterprises' actions.

7      95.    During the Class Period, defendants Laurienti and Walker were control persons of

8  Time Holdings, in that Laurienti and Walker have joint ownership of Time Holdings.  In this regard,

9  Laurienti and Walker had knowledge of and involvement in the day to day business of Time

10  Holdings.  As such, they had the power and ability to control Time Holdings' actions.

11                    **THIRD CLAIM FOR RELIEF**
    **For Violations of Sections 10(b) and 20A of The Securities Exchange Act of 1934**
12    (Against Attiazaz "Bob" Din, Javed Latif, Naureen Din, Zubair Ahmed, Ellis Posner,
          Mark Briggs, Verdell Garroutte, Jacob Stetton, Eric Keating and Robert Mercer)
13
        96.    Plaintiff incorporates by reference and realleges all preceding paragraphs as though
14
    fully set forth herein.
15
        97.    This claim is asserted against Defendants Attiazaz "Bob" Din, Javed Latif, Naureen
16
    Din, Zubair Ahmed, Ellis Posner, Mark Briggs, Verdell Garroutte, Jacob Stetton, Eric Keating and
17
    Robert Mercer  (the hereinafter "Insider Trading Defendants") pursuant to §§10(b) and 20A of the
18
    Exchange Act and Rule 10b-5 promulgated thereunder, by a Subclass consisting of all purchasers
19
    of En Pointe stock who purchased such stock contemporaneously with the insider sales of the Insider
20
    Trading Defendants, which took place between February 28 and March 15, 2000 as detailed herein.
21
        98.    During the Class Period, as detailed above, the Insider Trading Defendants, while in
22
    possession of material, non-public information concerning the supplemental offering of
23
    SupplyAccess stock and SupplyAccess' uncompetitive position, took advantage of the inflated
24
    market for En Pointe's stock by dumping their own shares on unwitting investors. In so doing, the
25
    Insider Trading Defendants garnered a total of approximately $50 million in proceeds.
26
        99.    The Insider Trading Defendants' stock sales were timed to take advantage of the
27
    information gap that existed between the time of the initial announcements and analyst reports
28

1   concerning SupplyAccess, and the revelation that En Pointe had reduced its ownership of

2   SupplyAccess to a minority position.  At the time of their insider sales, the Insider Trading

3   Defendants knew or recklessly disregarded that they possessed materially adverse non-public

4   information regarding the supplemental offering of SupplyAccess stock and the fact that

5   SupplyAccess was not a genuine competitor to Ariba and Commerce One in the B2B marketplace,

6   and that this information had not been disclosed to the investing public.

7         100.    As set forth above, the Insider Trading Defendants each violated §10(b) and 20A of

8   the Exchange Act and SEC Rule 10b-5.  As a direct and proximate result of the Defendants'

9   wrongful conduct, and by virtue of the fact that Plaintiff and the Subclass purchased shares of En

10   Pointe stock on the NASDAQ NMS contemporaneously, Plaintiff and the Subclass suffered damages

11   in connection with these purchases.  Such damages stem from the facts that Plaintiff and the Subclass

12   paid artificially inflated prices for En Pointe stock as a result of the Defendants' violations, and

13   would not have purchased at such inflated prices, if at all, had Defendants fulfilled their legal duty

14   to disclose the materially adverse non-public information or abstain from selling such securities.

15         101.    Plaintiff purchased 500 shares of En Pointe stock contemporaneously with the Insider

16   Trading Defendants' sales, as reflected in Plaintiff's certification, filed herewith.

17                              **PRAYER FOR RELIEF**

18        WHEREFORE, Plaintiff, on his own and on behalf of the Class, pray for judgment as

19   follows:

20         1.    Declaring this action to be a class action pursuant to Rules 23(a) and 23 (b)(3) of the

21   Federal Rules of Civil Procedure on behalf of the Class defined herein;

22         2.    Awarding Plaintiff and members of the Class rescissory or compensatory damages

23   in an amount which may be proven at trial, together with interest thereon;

24         3.    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment

25   interest, as well as their reasonable attorneys' fees and expert witness fees and other costs; and

26         4.    Awarding such other and further relief as this Court may deem just and proper

27   including any extraordinary equitable relief and/or injunctive relief as permitted by law or equity to

28   attach, impound or otherwise restrict the Defendants' assets to assure Plaintiff and the members of

Class Action Complaint

1  the Class have an effective remedy.

2  Dated: February 2, 2001

KRAUSE & KALFAYAN

3

4  By: _____
   James C. Krause, Esq.
5  Patrick N. Keegan, Esq.
   Attorneys for Plaintiff

6  Of Counsel:
   Burton H. Finkelstein, Esq.
7  Donald J. Enright, Esq.
   Jessica F. Whitehurst, Esq.
8  FINKELSTEIN, THOMPSON & LOUGHRAN
   1055 Thomas Jefferson Street, NW, Suite 601
9  Washington, DC 20007
   (202) 337-8000
10
   Ronald A. Marron, Esq.
11 MARRON & WILSON, LLP
   1475 Sixth Avenue, Suite 301
12 San Diego, CA 92101
   (619) 696-9006
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Class Action Complaint                                      26

1

## DEMAND FOR JURY TRIAL
### Rule 38(b) of the Federal Rules of Civil Procedure

2

3        Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by

jury of this action.

4

Dated: February 2, 2001                                KRAUSE & KALFAYAN

5

6                                                       By: _____

7                                                           James C. Krause, Esq.
                                                            Patrick N. Keegan, Esq.
8                                                           Attorneys for Plaintiff

9    Of Counsel:
     Burton H. Finkelstein, Esq.
10   Donald J. Enright, Esq.
     Jessica F. Whitehurst, Esq.
11   FINKELSTEIN, THOMPSON & LOUGHRAN
     1055 Thomas Jefferson Street, NW, Suite 601
12   Washington, DC 20007
     (202) 337-8000
13
     Ronald A. Marron, Esq., SBN 175650
14   MARRON & WILSON, LLP
     1475 Sixth Avenue, Suite 301
15   San Diego, CA 92101
     (619) 696-9006
16

17

18

19

20

21

22

23

24

25

26

27

28

Class Action Complaint                        27

James C. Krause, Esq., SBN 066478
Patrick N. Keegan, Esq., SBN 167698
KRAUSE & KALFAYAN
1010 Second Avenue, Suite 1750
San Diego, CA 92101
Tel:    (619) 232-0331
Fax:    (619) 232-4019

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGG A. RUFFALO, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>EN POINTE TECHNOLOGIES, INC.; ATTIAZAZ "BOB" DIN; JAVED LATIF; NAUREEN DIN; ZUBAIR AHMED; ELLIS POSNER; MARK BRIGGS; VERDELL GARROUTTE; JACOB STETTON; ERIC KEATING; ROBERT MERCER; HAMPTON-PORTER INVESTMENT BANKERS LLC; H-P HOLDINGS, LLC; TIME HOLDINGS, LLC; JSL HOLDINGS LP; JSL ENTERPRISES; LLC; JOHN WILLIAM LAURIENTI; and GREGORY WALKER,<br><br>    Defendants. | ) Case No.:<br>)<br>) SWORN CERTIFICATE OF GREGG A.<br>) RUFFALO AS REPRESENTATIVE<br>) PLAINTIFF, IN COMPLIANCE WITH<br>) SECTION 21D OF THE SECURITIES<br>) EXCHANGE ACT OF 1934<br>)<br>) [15 U.S.C. § 78u-4]<br>) |

02/02/01   16:25   ☎715 423 3230            BRAZEAU LAW                                    🗹005

01/30/01  TUE 14:15 FAX 619 2    1018     Case 3:01-cv-00205-BEN-AJB   Document 1   Filed 02/02/01   Page 32 of 47   🗹003
KRAUSE&RALPAYAN

I, Gregg A. Ruffalo, declare as follows:

1.      I am the named plaintiff in the above-entitled action and I am an adult resident of the State of Wisconsin. I have personal knowledge of the following facts and if called upon as a witness I could and would competently testify to the matters stated herein.

2.      This sworn certificate in support of appointment as lead class, representative plaintiff in the accompanying above-captioned, class action complaint is made in compliance with Section 21D of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4.

3.      I have read and reviewed the accompanying above-captioned, class action complaint and authorize its filing on my behalf.

4.      I purchased purchase purchased 500 shares of En Pointe Technologies, Inc. common stock (ENPT) on the NASDAQ NMS on March 30, 2000, at the price of $37.50 per share for a total of $18,750.00 and I sold these 500 shares on October 25, 2000, at the price of $4.3125 per share of a total $2,156.25, resulting in a realized loss of $16,593.75.

5.      I did not purchase the above-described En Pointe Technologies, Inc. shares that are the subject of the accompanying above-captioned, class action complaint at the direction of my attorneys or in order to participate in any private action arising under the Securities Exchange Act of 1934.

6.      I am willing to serve as a representative plaintiff on behalf of a class, including providing testimony at deposition and trial, if necessary.

7.      During the 3 year period preceding the date on which this sworn certificate is signed, I have not sought to serve as a representative party on behalf of a class under the Securities Exchange Act of 1934.

8.      I will not accept any payment for serving as the representative plaintiff on behalf of a class beyond my pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4) of Section 21D of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(4).

I declare under penalty of perjury that the foregoing is true and correct and this declaration is executed this 30th day of January, 2001 at Plainfield, Wisconsin.

Gregg A. Ruffalo

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 QrQbSzNWJNQsXwzVUOo3wAoUvKKtEogFOARivJ7YdFD91xMPxtvFDJ6OyBpnZZEt
 tkfgIFarT/9dvi8tZH+WMw==

<SEC-DOCUMENT>0000889812-99-003173.txt : 19991103
<SEC-HEADER>0000889812-99-003173.hdr.sgml : 19991103
ACCESSION NUMBER:              0000889812-99-003173
CONFORMED SUBMISSION TYPE:     SC 13D/A
PUBLIC DOCUMENT COUNT:         1
FILED AS OF DATE:              19991102


SUBJECT COMPANY:

       COMPANY DATA:
              COMPANY CONFORMED NAME:             EN POINTE TECHNOLOGIES INC
              CENTRAL INDEX KEY:                  0001010305
              STANDARD INDUSTRIAL CLASSIFICATION: WHOLESALE-COMPUTER & PERIPHE
              IRS NUMBER:                         752467002
              STATE OF INCORPORATION:             DE
              FISCAL YEAR END:                    0930

       FILING VALUES:
              FORM TYPE:           SC 13D/A
              SEC ACT:
              SEC FILE NUMBER:     005-49679
              FILM NUMBER:         99739458

       BUSINESS ADDRESS:
              STREET 1:            100 N. SEPULVEDA BLVD.
              STREET 2:            19TH FLOOR
              CITY:                EL SEGUNDO
              STATE:               CA
              ZIP:                 90245-
              BUSINESS PHONE:      3107251133

       MAIL ADDRESS:
              STREET 1:            100 N. SEPULVEDA BLVD.
              STREET 2:            19TH FLOOR
              CITY:                EL SEGUNDO
              STATE:               CA
              ZIP:                 90245-

FILED BY:

       COMPANY DATA:
              COMPANY CONFORMED NAME:             TIME HOLDINGS LLC
              CENTRAL INDEX KEY:                  0001096224
              STANDARD INDUSTRIAL CLASSIFICATION: []
              IRS NUMBER:                         330849138
              STATE OF INCORPORATION:             CA

       FILING VALUES:
              FORM TYPE:           SC 13D/A

       BUSINESS ADDRESS:
              STREET 1:            600 W BROADWAY
              STREET 2:            14TH FL
```

```
                    CITY:                     SAN DIEGO
                    STATE:                    CA
                    ZIP:                      92101
                    BUSINESS PHONE:           8005453345

            MAIL ADDRESS:
                    STREET 1:                 600 W BROADWAY
                    STREET 2:                 14TH FL
                    CITY:                     SAN DIEGO
                    STATE:                    CA
                    ZIP:                      92101
</SEC-HEADER>
<DOCUMENT>
<TYPE>SC 13D/A
<SEQUENCE>1
<DESCRIPTION>AMENDED BENEFICIAL OWNERSHIP STATEMENT
<TEXT>


<PAGE>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 13D/A
Under the Securities Exchange Act of 1934

En Pointe Technologies, Inc.
-----------------------------
(Name of issuer)

Common Stock
------------
(Title of class of securities)

29247F-10-8
-----------
(CUSIP Number)

Time Holdings, LLC
600 West Broadway, 14th Floor
San Diego, California 92101
800 545-3345
------------------------------------------------
(Name, address and telephone number of person
authorized to receive notices and communications)

September 22, 1999
------------------------------------------------
(Date of event which requires filing of this statement)

If the filing person has previously filed a statement on Schedule 13G to report
the acquisition which is the subject of this Schedule 13D, and is filing this
statement because of Rule 13d-1(b)(3) or (4), check the following |_|.

Check the following box if a fee is being paid with the statement |_|.

```
<PAGE>
```

1 NAME OF REPORTING PERSON

Time Holdings, LLC.

S.S. OR I.R.S. IDENTIFICATION NO. OF ABOVE PERSON
- ------------------------------------------------------------------------
2 CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP (a) |_|
                                                   (b) |_|
- ------------------------------------------------------------------------
3 SEC USE ONLY
- ------------------------------------------------------------------------
4 SOURCE OF FUNDS

PF
- ------------------------------------------------------------------------
5 CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEMS
2(d) or 2(e)
                                                        |_|
- ------------------------------------------------------------------------
6 CITIZENSHIP OR PLACE OF ORGANIZATION      State of California
- ------------------------------------------------------------------------
NUMBER OF        7 SOLE VOTING POWER  - 0
SHARES           ---------------------------------------------------------
BENEFICIALLY     8 SHARED VOTING POWER - 522,700
OWNED BY         ---------------------------------------------------------
EACH             9 SOLE DISPOSITIVE POWER - 0
REPORTING        ---------------------------------------------------------
PERSON           10 SHARED DISPOSITIVE POWER WITH - 522,700
WITH             ---------------------------------------------------------

11. AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON

522,700
- ------------------------------------------------------------------------
12 CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES
                                                        |_|
- ------------------------------------------------------------------------
13 PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)

8.8%
- ------------------------------------------------------------------------
14 TYPE OF REPORTING PERSON

OO
- ------------------------------------------------------------------------

<PAGE>

Item 1. Security and Issuer.

     This Amendment No. 1 relates to the Schedule 13D filed with the Securities
and Exchange Commission on October 7, 1999, by Time Holdings, LLC., a limited
liability company with respect to the common stock, par value $.01per share (the
"Common Stock"), of En Pointe Technologies, Inc. (the "Issuer"). The Issuer is a
Delaware corporation with its principal executive offices located at 100 North
Sepulveda Boulevard, 19th Floor, El Segundo, California 90245. Other than set
forth herein, there have been no material changes in the information set forth
in Items 1 through 7 of this Schedule as amended.

Item 2. Identity and Background.

     This Amendment is being filed on behalf of Time Holdings, LLC., a limited
liability company ("Time Holdings"). The address of the principal business and
principal office of Time Holdings is 600 West Broadway, 14th Floor, San Diego,
California. The managing members of Time Holdings are Gregg Walker and John
Laurienti. The principal business of Time Holdings is making investments and

managing assets.

(d) During the past five years, neither the Filing Persons, nor, to the knowledge of the Filing Persons, any person who is a member of the limited liability company, has been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors).

(e) On October 5, 1995, the Securities and Exchange Commission found that John Laurienti failed to properly discharge his supervisory responsibilities while acting as a branch manager for Dickenson & Co. As a result of that finding, John Laurienti was barred from acting in a proprietary or supervisory capacity with any broker dealer, municipal securities dealer, investment advisor or investment company. In addition, the Securities and Exchange Commission imposed a civil penalty on Mr. Laurienti of $10,000.

On October 24, 1994, the Massachusetts Division of Securities found that John Laurienti failed to properly discharge his supervisory responsibilities. As a result, John Laurienti was barred from acting in a supervisory capacity in the securities industry for 18 months and was instructed to pay a fine of $20,000. The acts of John Laurienti that led to this finding by the Massachusetts Securities Division are directly related to the acts that led to the above-mentioned finding by the Securities and Exchange Commission.

Other than the disclosures made about John Laurienti, during the last five years, neither the Filing Persons, nor, to the knowledge of the Filing Persons, any person, excluding John Laurienti, who is a member of the limited liability company, was a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws.

Item 3. Source and Amount of Funds or Other Consideration.

<PAGE>

Time Holdings used the personal funds and working capital of its members and margin loans from J.B. Oxford, E Trade, Jack White, Spear Leeds and Kellogg, Charles Schwab, and TD Waterhouse to acquire the shares reported herein.

Item 4. Purpose of Transaction.

The purpose of the acquisition of En Pointe Technologies Common Stock is solely for investment purposes. Time holdings has no plans or proposals that relate or would result in any of the matters referred to in paragraphs (a) through (j) inclusive, of Item 4 of Schedule 13D. However, the reporting persons may from time to time review and reconsider their positions with respect to any such matter.

Item 5. Interest in Securities of the Issuer.

(a) Time Holdings maybe deemed to each be the beneficial owner of 522,700 shares of Common Stock for purposes of Rule 13d-1(a) promulgated under the Securities Exchange Act of 1934, as amended, which represents approximately 8.8% of the shares of Common Stock outstanding (based on the number of shares of Common Stock issued outstanding on August 14, 1999).

(b) The number of shares as to which Time Holdings has:

    (i)   sole power to vote or direct the vote is 0.

    (ii)  shared power to vote or to direct the vote is 522,700.

(iii) sole power to dispose or to direct the disposition of 0.

(iv)  shared power to dispose of or direct the disposition of 522,700.

(c) To the knowledge of the Filing Persons, during the past dates since most recent filing of a 13D the Filing Persons have acquired or disposed of the shares annexed hereto in Exhibit A.

Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer.

    There are no contract, arrangements, understandings, or relationships (legal or otherwise) among the persons named in Item 2 and between such person and any person with respect to any securities of the issuer, including but not limited to transfer or voting of any of the securities, finder's fees, joint ventures, loan or option arrangements, puts or calls, guarantees profits, division of profits or loss, or giving or withholding proxies, naming the persons with whom such contracts, arrangements, understandings or relationships have been entered into. There are no securities that are pledged or otherwise subject to a contingency which would give another person voting power or investment power over such securities.

Item 7.  Material to Be Filed as Exhibits

<PAGE>

    N/A. The only Exhibit is the information requested in Item 5(c).

Signature

    After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Dated: November 2, 1999

Time Holdings, LLC

/s/  Greg Walker
- ---------------------------------
Name and Title

<PAGE>

EXHIBIT A

<TABLE>
<CAPTION>

| Security | Date | # of Shares Bought | # of Shares Sold | Prior |
|----------|------|--------------------|------------------|-------|
| <S> | <C> | <C> | <C> | <C> |
| ENPT | 16-Sep-99 | 2,500 | | |
| ENPT | 16-Sep-99 | 1,000 | | |
| ENPT | 16-Sep-99 | 1,000 | | |
| ENPT | 16-Sep-99 | 1,000 | | |
| ENPT | 16-Sep-99 | 2,000 | | |

| | | | |
|------|-----------|-------|-------|
| ENPT | 16-Sep-99 | 2,000 | |
| ENPT | 16-Sep-99 | | 1,000 |
| ENPT | 16-Sep-99 | | 2,000 |
| ENPT | 16-Sep-99 | -- | |
| ENPT | 16-Sep-99 | | 10,000 |
| ENPT | 16-Sep-99 | | 10,000 |
| ENPT | 16-Sep-99 | | 5,900 |
| ENPT | 17-Sep-99 | 200 | |
| ENPT | 17-Sep-99 | 500 | |
| ENPT | 17-Sep-99 | 1,000 | |
| ENPT | 17-Sep-99 | 1,000 | |
| ENPT | 17-Sep-99 | 1,000 | |
| ENPT | 17-Sep-99 | 1,000 | |
| ENPT | 17-Sep-99 | 1,000 | |
| ENPT | 17-Sep-99 | 1,000 | |
| ENPT | 17-Sep-99 | 1,500 | |
| ENPT | 17-Sep-99 | 1,800 | |
| ENPT | 17-Sep-99 | 2,000 | |
| ENPT | 17-Sep-99 | 800 | |
| ENPT | 17-Sep-99 | 1,000 | |
| ENPT | 17-Sep-99 | 1,000 | |
| ENPT | 17-Sep-99 | 1,200 | |
| ENPT | 17-Sep-99 | 2,000 | |
| ENPT | 17-Sep-99 | 2,000 | |
| ENPT | 17-Sep-99 | 2,000 | |
| ENPT | 17-Sep-99 | 2,500 | |
| ENPT | 17-Sep-99 | 2,500 | |
| ENPT | 17-Sep-99 | 2,500 | |
| ENPT | 17-Sep-99 | 1,000 | |
| ENPT | 17-Sep-99 | | 500 |
| ENPT | 17-Sep-99 | | 100 |
| ENPT | 17-Sep-99 | | 1,900 |

| Security | Date | # of Shares Bought | # of Shares Sold | Prior |
|---|---|---|---|---|
| ENPT | 17-Sep-99 | | 100 | |
| ENPT | 17-Sep-99 | 500 | | |
| ENPT | 17-Sep-99 | 1,000 | | |
| ENPT | 20-Sep-99 | 400 | | |
| ENPT | 20-Sep-99 | 100 | | |
| ENPT | 20-Sep-99 | | 10,000 | |
| ENPT | 20-Sep-99 | | 10,000 | |

</TABLE>

<PAGE>
<TABLE>
<CAPTION>

| Security | Date | # of Shares Bought | # of Shares Sold | Pri or |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| ENPT | 20-Sep-99 | 100 | | |
| ENPT | 20-Sep-99 | 1,250 | | |
| ENPT | 21-Sep-99 | | 300 | |
| ENPT | 21-Sep-99 | | 1,000 | |
| ENPT | 21-Sep-99 | | 1,200 | |
| ENPT | 21-Sep-99 | 31,250 | | |
| ENPT | 21-Sep-99 | | 100 | |
| ENPT | 21-Sep-99 | | 10,000 | |
| ENPT | 21-Sep-99 | | 10,000 | |
| ENPT | 21-Sep-99 | | 10,000 | |
| ENPT | 21-Sep-99 | | 31,250 | DT |
| ENPT | 21-Sep-99 | 10,000 | | |
| ENPT | 21-Sep-99 | 10,000 | | |
| ENPT | 21-Sep-99 | 10,000 | | |
| ENPT | 22-Sep-99 | 1,000 | | |
| ENPT | 22-Sep-99 | 1,000 | | |
| ENPT | 22-Sep-99 | 1,000 | | |
| ENPT | 22-Sep-99 | 1,000 | | |
| ENPT | 22-Sep-99 | 1,000 | | |

| ENPT | 22-Sep-99 | 1,000 | |
| ENPT | 22-Sep-99 | 1,000 | |
| ENPT | 22-Sep-99 | 1,000 | |
| ENPT | 22-Sep-99 | 1,000 | |
| ENPT | 22-Sep-99 | 1,000 | |
| ENPT | 22-Sep-99 | 1,000 | |
| ENPT | 22-Sep-99 | 1,000 | |
| ENPT | 22-Sep-99 | 1,000 | |
| 27k cxl | 22-Sep-99 | | 10,000 |
| ENPT | 22-Sep-99 | 10,000 | |
| ENPT | 22-Sep-99 | 20,000 | |
| ENPT | 22-Sep-99 | 8,750 | |
| ENPT | 23-Sep-99 | 500 | |
| ENPT | 23-Sep-99 | 500 | |
| ENPT | 23-Sep-99 | 1,500 | |
| ENPT | 23-Sep-99 | 550 | |
| ENPT | 23-Sep-99 | 1,000 | |
| ENPT | 23-Sep-99 | 10,500 | |
| ENPT | 23-Sep-99 | 9,900 | |
| ENPT | 23-Sep-99 | | 400 |
| ENPT | 24-Sep-99 | 50 | |
| ENPT | 24-Sep-99 | 10,000 | |
| ENPT | 24-Sep-99 | 30,000 | |
| ENPT | 28-Sep-99 | | 700 |
| ENPT | 30-Sep-99 | 950 | |
| ENPT | 30-Sep-99 | | 1,500 |
| ENPT | 30-Sep-99 | | 160,000 |
| ENPT | 30-Sep-99 | 160,000 | D |
| ENPT | 01-Oct-99 | 500 | |
| ENPT | 01-Oct-99 | 500 | |
| ENPT | 01-Oct-99 | 500 | |
| ENPT | 01-Oct-99 | 3,500 | |

```
- -------------------------------------------------------------------------
      ENPT           01-Oct-99                                    98,750
- -------------------------------------------------------------------------
</TABLE>

<PAGE>
<TABLE>
<CAPTION>
```

| Security | Date | # of Shares Bought | # of Shares Sold | Pri or |
|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` |
| ENPT | 04-Oct-99 | | 30,000 | DTC |
| ENPT | 04-Oct-99 | 30,000 | | DTC |
| ENPT | 06-Oct-99 | 98,750 | | DTC |
| ENPT | 06-Oct-99 | 2,000 | | |
| ENPT | 13-Oct-99 | 500 | | |
| ENPT | 13-Oct-99 | 250 | | |
| ENPT | 13-Oct-99 | 500 | | |
| ENPT | 14-Oct-99 | | 300 | |
| ENPT | 14-Oct-99 | | 1,500 | |
| ENPT | 14-Oct-99 | | 1,100 | |
| ENPT | 14-Oct-99 | | 2,000 | |
| ENPT | 14-Oct-99 | | 2,600 | |
| ENPT | 20-Oct-99 | | 600 | |
| ENPT | 20-Oct-99 | | 600 | |
| ENPT | 20-Oct-99 | | 600 | |
| ENPT | 28-Oct-99 | | 50,000 | |
| | | 518,800 | 476,000 | |
| | Total for 9/16/99 - 10/28/99 | | 42,800 | |

```
</TABLE>
```

| Commissions | | Trades | |
|---|---|---|---|
| Charles Schwab | $89.85 | Buys | 622,700 |
| Etrade | $354.05 | Sells | 476,000 |
| Hamilton | $10,741.66 | Total | 1,098,700 |

```
        JB Oxford              $--
 - --------------------------------
        My Discount            $--
 - --------------------------------
           Olde             $120.00
 - --------------------------------
        TD Wtrhouse          $528.00
                                                              ------------
                                           Total Position        522,700
                                                              ------------
        Comm. Total         $11,833.56

                    Average Cost         $10.92
```

```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

# DECLARATION OF ADAM G. GILMAN

Re:   CHRISTOPHER L. ALBRICK v. HAMPTON-PORTER aka Hampton-Porter Investment Bankers, a corporation; JOHN W. LAURIENTI, an individual; GREGORY D. WALKER, an individual; JAMES GREEN, an individual; JEFFREY JANDA, an individual; THEODORE GARRINGTON, an individual; and JANDA & GARRINGTON, LLC, a limited liability corporation; NASD Case No. 99-04557.

1.     I, Adam G. Gilman, make this declaration at the request of Christopher L. Albrick for use in the above-captioned action. I am a former registered representative of Hampton-Porter, and Christopher Albrick was a client of mine at Hampton-Porter at one time.

2.     On certain transactions in EMB Corporation, I was offered an incentive payment by Hampton-Porter of 10% of the value of EMB Corporation shares, but did not charge a regular commission on transactions since I was receiving a payment. I did not disclose this fact to Christopher Albrick when I recommended EMB Corporation to him, nor am I aware of anyone at Hampton-Porter telling Christopher Albrick about this incentive at the time the stock was being recommended, or at any time thereafter. Albrick purchased 50,000 shares of EMB Corporation.

3.     Christopher Albrick had discussed selling his EMB Corporation shares with me and management of Hampton-Porter (Jim Green, John Laurienti [an owner]), and analyst Mark Bergman told me to recommend against selling the stock when the stock was approximately $2.40 per share. I was told that institutional buyers would be buying EMB Corporation for $3.00 or better per share. I described to Mr. Albrick a situation in which institutions could not buy the stock until it was trading for at least $3.00 per share, but, as I was told, institutions ~~were lined~~ up to purchase the stock at that price ($3.00 or better), plus a NASDAQ listing was forthcoming.

4.     I was offered an incentive payment to sell En Pointe ("ENPT"), but did not charge a regular commission on transactions since I was receiving a payment. Christopher Albrick

May 8, 2000

1

L:\Gilman\Gilman_Albrick.AX.wpd

defaulted on his order for ENPT and, despite responding otherwise, never paid for his stock. I told Jim Green to liquidate the ENPT while it was at a profit. Jim Green refused to accept the sale ticket, waiting until after ENPT dropped in value, causing Christopher Albrick a loss. I forfeited concessions described for EMBU and ENPT if my clients later sold the shares in either of those respective corporations. I purchased at least 25% of each position, EMBU and ENPT, with no compensation whatsoever or concession. It was made clear to me that Hampton-Porter at certain times wanted to support the prices of those two stocks, among others.

5.   John Laurienti would regularly call meetings with the registered representatives of Hampton-Porter wherein he would advise of reasons to recommend EMB Corporation stock to our clients.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

DATED this 11 day of May, 2000.

Adam G. Gilman

TOTAL P.04

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

| I (a) PLAINTIFFS GREGG A. RUFFALO, on behalf of himself and all others similarly situated | DEFENDANTS EN POINTE TECHNOLOGIES, INC., et al. |
|---|---|

01 FEB 2 PM 4:01

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Plainfield (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT San Diego (IN U.S. PLAINTIFF CASES ONLY) |
|---|---|
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Patrick N. Keegan (619) 232-0331 KRAUSE & KALFAYAN 1010 Second Ave., Ste. 1750 San Diego, CA 92101 | ATTORNEYS (IF KNOWN) '01 CV 0205 L (CGA) |
|---|---|

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).

Violations of Sections 10(b) and 20A of the Securities and Exchange Act of 1934.

15:0078

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce ICC Rates, etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 862 Black Lung (923) | |
| ☐ 160 Stockholders Suits | | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ Security Act | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prisoner Conditions | | | |

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding  ☐ 2 Removal from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

| VII. REQUESTED IN COMPLAINT: | ☒ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 | DEMAND $ 50 Million | Check YES only if demanded in complaint JURY DEMAND: ☒ YES ☐ NO |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY (See Instructions): | JUDGE | Docket Number |
|---|---|---|

| DATE February 2, 2001 | SIGNATURE OF ATTORNEY OF RECORD Patrick N Keegan |
|---|---|